CARLSMITH BALL LLP

WILLIAM M. HARSTAD            8942
IAN R. WESLEY-SMITH          10626
1001 Bishop Street, Suite 2100
Honolulu, HI  96813
Tel No. 808.523.2500
Fax No. 808.523.0842
wharstad@carlsmith.com
iwesley-smith@carlsmith.com

KATHERINE A. GARSON          5748
121 Waianuenue Avenue
P.O. Box 686
Hilo, HI  96721-0686
Tel No. 808.935.6644
Fax No. 808.935.7975
kgarson@carlsmith.com

Attorneys for Plaintiff
NEW CINGULAR WIRELESS PCS, LLC dba
AT&T MOBILITY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| NEW CINGULAR WIRELESS PCS, LLC dba AT&T MOBILITY<br><br>            Plaintiff,<br><br>   vs.<br><br>CALVARY CHAPEL KANEOHE INC.,<br><br>            Defendant. | CIVIL NO. _____<br><br>**COMPLAINT; DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT</u>

## PARTIES

1.      Plaintiff New Cingular Wireless PCS, LLC dba AT&T Mobility ("**AT&T**") is a Delaware limited liability company with its principal place of business in Atlanta, Georgia, registered to do business in the State of Hawaiʻi.

2.      Defendant Calvary Chapel Kaneohe Inc. ("**Landlord**") is a Hawaiʻi non-profit corporation.  On information and belief, Landlord's principal place of business is in the City and County of Honolulu.

3.      Does 1-20 are individuals, government or municipal entities, corporations, partnerships, or other entities whose names, identities, capacities, activities, or responsibilities are presently unknown to AT&T, or its attorneys, and are sued herein under fictitious names for that reason.  AT&T has been unable to ascertain which persons or entities were involved in the wrongful conduct complained of herein.  AT&T will certify their true names, capacities, activities, and responsibilities when the same are ascertained.

## JURISDICTION & VENUE

4.      This Court has jurisdiction under 28 U.S.C. § 1332.

5.      The sole member of AT&T is AT&T Mobility II LLC, a Delaware limited liability company with its principal place of business in Georgia.

6.      AT&T Mobility II LLC has three members:  (1) BellSouth Mobile Data, Inc., a Georgia corporation with its principal place of business in Georgia; (2) AT&T Corp., a New York corporation with its principal place of business in New Jersey; and (3) AT&T Mobility LLC, a Delaware limited liability company with its principal place of business in Georgia.

7.      AT&T Mobility LLC has four members:  (1) BellSouth Mobile Data, Inc., a Georgia corporation with its principal place of business in Georgia; (2) SBC Long Distance, LLC, a Delaware limited liability company with its principal place of business in Texas; (3) New Cingular Wireless Services, Inc., a Delaware corporation with its principal place of business in Georgia; and (4) AT&T Investment and Tower Holdings, LLC, a Delaware limited liability company with its principal place of business in Texas.

8.      SBC Long Distance, LLC's sole member is SBC Telecom, Inc., a Delaware corporation with its principal place of business in Texas.

9.      AT&T Investment and Tower Holdings, LLC has four members:  (1) AT&T Capital Services, Inc., a Delaware corporation with its principal place of business in Texas; (2) SBC Portfolio Holdings, Ltd., a Delaware corporation with its principal place of business in Texas; (3) SBC Telecom, Inc., a Delaware corporation with its principal place of business in Texas; and (4) JVI

General Partnership, a Delaware General Partnership with its principal place of business in New Jersey.

10.    JVI General Partnership has two partners:  (1) AT&T Corp., a New York corporation with its principal place of business in New Jersey; and (2) AT&T Solutions Inc., a Delaware corporation with its principal place of business in New Jersey.

11.    Accordingly, for diversity jurisdiction purposes, AT&T is a citizen of the following states:  Delaware, New York, New Jersey, Georgia, and Texas.

12.    Landlord, as a Hawaiʻi non-profit corporation with its principal place of business in the City and County of Honolulu, is a citizen of Hawaiʻi for diversity jurisdiction purposes.

13.    Complete diversity of citizenship among the parties exists as to every claim alleged in this complaint (Delaware, New York, New Jersey, Georgia, and Texas on one of side, and Hawaiʻi on the other).

14.    The amount in controversy exceeds $75,000.

15.    AT&T estimates that it would cost approximately $650,000.00 to relocate the subject antennas at this time.  Even if AT&T were to co-locate onto a different, existing tower, the costs would include, *inter alia*, the needed structural modifications to accommodate the antennas, shelters and pads, running fiber-optic

and power cables to the new location, and purchasing replacement equipment.  In general, these costs can run between $500,000 and $1.5 million.

16.    Venue is governed by the provisions of 28 U.S.C. § 1391(b)(2). Venue is proper here, in that "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in this judicial district.  *Id.*

17.    This Court has personal jurisdiction over all parties; AT&T's cause of action concerns a dispute between AT&T and Landlord over a contract concerning real and personal property located in Hawaiʻi.

## AT&T'S BUSINESS

18.    AT&T provides personal wireless services to its customers throughout the State of Hawaiʻi, including in the City and County of Honolulu.

19.    The licenses authorizing AT&T to provide wireless service in the City and County of Honolulu were issued by the Federal Communications Commission pursuant to the Telecommunications Act of 1996, 47 U.S.C. § 151 et seq., as amended (the "**Act**").  The Act establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination . . . a rapid, efficient, Nation-wide and worldwide wire and radio communications service with adequate facilities at reasonable charges for the

purposes of national defense [and] for the purpose of promoting safety of life and property through the use of wire and radio communications."  47 U.S.C. § 151.

20.     To meet the policy goals that Congress has established and to provide personal wireless services to local businesses, public safety entities, and the general public, AT&T must, among other things, create and maintain a network of cell sites, each of which consists of antennas and related equipment designed to send and receive radio signals.

21.     As part of its business in the City and County of Honolulu, AT&T also deploys, operates, and maintains the FirstNet public safety communications platform ("**FirstNet**"), which is a high-speed nationwide wireless broadband network used by public safety agencies and "first responders."  In the City and County of Honolulu, the "first responders" who rely on AT&T's FirstNet include the Honolulu Police Department ("**HPD**"), the Honolulu Fire Department ("**HFD**"), and Emergency Medical Services ("**EMS**").

## THE LEASE

22.     In or around 1995, AT&T's predecessor-in-interest entered into a lease with Landlord's predecessor-in-interest ("**Lease**"), concerning a commercial property located at 47-525 Kamehameha Highway, in Kahaluʻu, City and County of Honolulu ("**Property**").

23.    AT&T has succeeded and assumed all rights and obligations from its predecessor-in-interest under the Lease, as amended.

24.    Landlord has succeeded and assumed all rights and obligations from its predecessor-in-interest under the Lease, as amended.

25.    The Lease grants AT&T the right to use and occupy a rooftop portion of the Property ("**Rooftop Premises**"), "together with the full right of access to the [Rooftop] Premises over and across the Property[.]"

26.    The Lease gives AT&T the right to construct, maintain, and operate radio communications and related infrastructure on the Rooftop Premises, and the right to use that equipment and infrastructure "in connection with communications related activities."

27.    The Lease unambiguously provides that Landlord may not interfere with AT&T's communications related activities; among other things, Landlord may not allow "any radio frequency transmitter equipment on the Property which may interfere with the operation of [AT&T's] radio communications from the Premises."

28.    The Lease provides that "there are no covenants, conditions, or restrictions on the Property, whether recorded or otherwise, which would prohibit or restrict the operation of [AT&T's] radio communications operations on the Premises."

29.     The Lease provides AT&T with the right of "peaceful enjoyment," including "the privilege of occupying the [Rooftop] Premises for the term hereof without hindrance or interruption by Lessor or any other persons lawfully claiming by, though, or under Lessor[.]"

30.     The Lease provides that if Landlord seeks to declare AT&T in "default" for any claimed failure to "observe and perform any condition or covenant in th[e] Lease," Landlord must first give AT&T written notice of the default, and provide AT&T with a minimum 30-day right to cure.

31.     The Lease provided for an "Initial Term" of ten (10) years, which could be extended for two consecutive five-year (5) periods.  In total, the Lease initially contemplated a potential term of twenty (20) years.

32.     On or about February 11, 2002, Landlord's predecessor-in-interest and AT&T's predecessor-in-interest entered into an Amendment of Lease. The Amendment of Lease modified the Lease by, among other things, allowing AT&T's predecessor-in-interest to build additional equipment and infrastructure on the Rooftop Premises, to "keep up with the ever-changing needs and demands in the communications industry and to improve the quality of service to . . . customers throughout the State of Hawaii."  The Amendment to Lease provided that "[e]xcept as modified herein, all other terms and conditions of said [Lease] shall remain in full force and effect and shall remain unmodified."

33.     On or about August 22, 2003, Landlord's predecessor-in-interest and AT&T's predecessor-in-interest entered into a Second Amendment of Lease.  The Second Amendment of Lease clarified and memorialized organizational changes and assignments of rights within and among Landlord's predecessor-in-interest, and clarified the proper recipient of lease payments.  The Second Amendment to Lease provided that "[e]xcept as modified herein, all other terms and conditions of the [Lease] shall remain in full force and effect and shall remain unmodified."

34.     In or around June 2012, AT&T and Landlord's predecessor-in-interest entered into a Third Amendment of Lease.

35.     The Third Amendment of Lease, among other things, granted AT&T the right to install and operate additional antennas, associated cables, and equipment to the Rooftop Premises, as well as a new exterior access ladder to the Rooftop Premises.  The Third Amendment of Lease grants AT&T the right to "add, modify and/or replace equipment in order to be in compliance with any current or future federal, state or local mandated application, including but not limited to emergency 911 communication services."

36.     The Third Amendment of Lease also gave AT&T the right to extend the Lease for an additional two consecutive five-year (5) periods, to extend the lease term through 2025:

Provided that Lessee is not in default hereof, Lessee shall have the option to extend this Agreement for two (2) additional five (5) year periods commencing on December 1, 2015 ("The Additional Renewal Term") upon the same terms and conditions herein (except as to the rental amount) upon the condition that Lessee shall deliver to Lessor written notice of intent to extend the term at least one hundred twenty (120) days prior to the expiration of the previous term of the Lease. The monthly rent during each year of the Additional Renewal Term shall increase by five percent (5%) from the monthly Basic Rent of the prior twelve (12) month period.

37.    The Third Amendment of Lease provides that "[e]xcept as expressly set forth in this Third Amendment, the [Lease] otherwise is unmodified and remains in full force and effect."

## LANDLORD PURCHASED THE PROPERTY SUBJECT TO THE LEASE

38.    In or around December 2014, Landlord purchased the Property, including the commercial building and Rooftop Premises contained on the Property, from its predecessor(s)-in-interest.

39.    On information and belief, Landlord acquired the Property to operate Calvary Chapel Windward.

40.    Landlord purchased the Property subject to AT&T's rights under the Lease, as amended. As discussed above, the Lease, as amended (1) gives AT&T the right to use and maintain equipment and infrastructure on the Rooftop Premises "in connection with communications related activities;" and (2) prevents Landlord from interfering with AT&T's use of the Rooftop Premises.

41.    When Landlord purchased the Property in 2014, AT&T and its predecessor-in-interest had been using the Rooftop Premises to serve their customers in the City and County of Honolulu for nearly **two decades**.  As of 2014, AT&T had installed ten (10) roof top antenna of various sizes on the Rooftop Premises.

42.    Prior to Landlord's purchase of the Property, AT&T and its predecessor-in-interest had extended the Lease for both consecutive five-year periods.  Accordingly, the Lease was extended through November 30, 2015.

43.    Shortly after Landlord purchased the Property, AT&T further extended the Lease for the first additional five-year period, extending the Lease from December 1, 2015 through November 30, 2020.

## BEGINNING IN 2015, LANDLORD HAS SEARCHED FOR A PRETEXT TO TERMINATE THE LEASE

44.    Following Landlord's purchase of the Property, it quickly became apparent that Landlord and its pastor, Pastor J.D. Farag, were not happy with AT&T's contractual right to use the Rooftop Premises.

45.    AT&T later learned, on information and belief, that during negotiations for purchase of the Property, Pastor J.D. Farag expressed his desire to have Landlord purchase the Property free and clear of the Lease.  When Pastor J.D. Farag was informed that the Property was to be sold subject to the Lease, he expressed his intent to honor only the first lease extension (for the lease term

extension commencing December 1, 2015), and to not honor the second lease

extension (for the lease term extension commencing December 1, 2020) - this was

despite the fact that Landlord had no right to unilaterally disregard AT&T's rights

under the Lease in regard to the lease term, which had been negotiated years before

Landlord purchased the Property.

46.    After purchasing the Property, Landlord immediately engaged

in an aggressive pattern of confrontation towards AT&T, in a thinly-veiled attempt

to either fabricate grounds for terminating the Lease, or to cause AT&T to

withdraw from the Lease.

47.    On or about April 8, 2015, AT&T received a letter from

Landlord regarding Landlord's planned renovation of the Property, including a

planned renovation and reroofing of the Rooftop Premises.

48.    Landlord gave AT&T 30 days' notice to remove its equipment

from the Rooftop Premises.  The Lease did not allow Landlord the right to demand

that AT&T remove equipment upon 30-day notice, however.  Given the nature of

AT&T's business, Landlord's unilateral 30-day notice was manifestly

unreasonable and a breach of the Lease.

49.    Landlord's letter threatened a "lengthy interruption of service"

and invited AT&T to terminate the Lease, writing:  "Moreover, we are certain that

it may take three months at the very minimum to complete the replacement of the

roof.  ***As such, we would be amenable to you terminating said lease due to this***
***lengthy interruption of service***" (emphasis added).

50.    In a letter dated April 17, 2015, AT&T notified Landlord that
the Lease did not allow Landlord to unilaterally terminate the Lease, nor did the
Lease require AT&T to remove its equipment and interrupt its communication
services.  AT&T informed Landlord that AT&T "provides a critical
communications service (including E911 service) that is relied upon by the general
public," and that "[c]losing down a communications facility . . . requires
significant coordination, technical modifications, installation of additional
equipment to replace the wireless coverage currently provided by [the] facility, and
possible notification and/or approvals by various federal, state and city agencies,
all at considerable cost to AT&T."  Nevertheless, AT&T offered to work with
Landlord to come up with "creative solutions" to accommodate Landlord's desire
to renovate the Property while ensuring that AT&T's critical services were not
interrupted.

51.    On or about July 20, 2015, while negotiations between the
parties regarding the roofing work were still ongoing, Landlord wrote a threatening
email to AT&T, stating "***[h]as AT&T been apprised of our intentions to pursue a***
***legal course of action to terminate said lease***?" (emphasis added).

52.     As a good-faith accommodation to Landlord, in the face of Landlord's threatened breach of the Lease, AT&T offered to reposition its equipment in coordination with Landlord's contractors, and to pay $7,742.31 towards Landlord's roof renovation costs.

53.     Beginning in 2015, without any reasonable basis for doing so, Landlord began to dispute AT&T's compliance with FCC regulations for radio frequency exposure.

54.     On or about July 24, 2015, Landlord abruptly demanded documentation from AT&T, including "a copy of the environmental statement, environmental assessment, or an environmental impact statement that was required to have been filed by AT&T with the FCC in order to obtain your licenses for the antennas at the [Rooftop Premises]."

55.     AT&T provided all relevant and requested FCC documentation to Landlord.

56.     In or around August 2015, in an email from Pastor J.D. Farag, Landlord disputed the sufficiency of the documentation provided by AT&T, and expressed concern about "radiation levels of areas within the building."

57.     In response to Landlord's concerns, AT&T provided a Certificate of AM Regulatory Compliance and shared analysis performed by Waterford Consultants, LLC on the radio frequency exposure levels on the

Property.  Waterford Consultants, LLC found that the maximum radio frequency exposure level found on the Property was within FCC's maximum permissible exposure limits for the general population/uncontrolled exposure category.

58.     Landlord was still not satisfied, and, on information and belief, went so far as to hire its own consultant, Mr. Milton Ikawa, in an attempt to dispute Waterford Consultants, LLC's analysis, to show that AT&T was somehow violating FCC regulations.

59.     On information and belief, Landlord questioned and disputed AT&T's compliance with FCC regulations as a pretext to terminate the Lease, or to cause AT&T to withdraw from the Lease.

60.     To placate Pastor J.D. Farag's expressed concerns about radio frequency exposure, AT&T ultimately constructed additional barriers and signage on the Rooftop Premises.

61.     Notwithstanding Landlord's repeat harassment of AT&T and consistent violations of the Lease, including the covenant of quiet enjoyment, AT&T has complied with the Lease and timely paid all rent from 2015 through January 2021.

## IN NOVEMBER 2020, LANDLORD ASSERTED A SUPPOSED TECHNICAL, IMMATERIAL BREACH TO PURPORTEDLY TERMINATE THE LEASE

62.     As discussed above, AT&T has the right to extend the lease for the second five-year period, from December 1, 2020 through November 30, 2025, and has consistently made its intent to extend the Lease for the second five-year period clear to Landlord.

63.     Nevertheless, due to an inadvertent oversight, AT&T did not provide formal written notice to Landlord of its intent to extend the Lease by August 2, 2020 (120 days prior to the expiration of the Lease).

64.     Landlord never reached out to AT&T to inquire about the Lease or a potential extension of the Lease.

65.     On or about November 15, 2020, without any prior notice to AT&T, Landlord sent AT&T a "Notice of Termination."

66.     Landlord's Notice of Termination purported to terminate the Lease, effective November 30, 2020, solely on the grounds that AT&T did not provide formal written notice that it was extending the Lease before August 2, 2020.  Landlord stated that AT&T was to "remove all improvements, fixtures and chattels you placed in the premises."

67.     On November 16, 2020, AT&T provided Landlord with formal written notice of its intent to extend the lease through November 30, 2025.

AT&T's written notice was provided *before* the Lease expired on November 30, 2020.

68.     The purportedly untimely notice from AT&T for exercise of its option to extend the Lease term through November 30, 2025 is not a material breach of the Lease.

69.     Landlord suffered no prejudice from AT&T's extension of the Lease; AT&T is using the Rooftop Premises in the same manner that AT&T and its predecessor-in-interest have used it for the past twenty-five (25) years. Landlord knew at the time it purchased the Property that the Property could be subject to the Lease through 2025.

70.     An abrupt termination of the Lease will cause harm to AT&T, AT&T's customers that utilize AT&T's network, and the Hawaiʻi "first responders" who rely on AT&T's FirstNet platform.

71.     Landlord did not provide AT&T with the required 30-day right to cure before attempting to declare a default and terminate the Lease.

72.     Landlord has refused to recognize AT&T's extension of the Lease.  Landlord has continued to insist that the Lease is terminated and has demanded that AT&T remove its equipment from the Property by January 31, 2021.

73.     AT&T has continued to comply with the Lease and to timely pay rent.

74.     Landlord has seized on AT&T's purportedly untimely notice as a pretext to try to terminate the Lease or force AT&T to withdraw from the Lease.

75.     In multiple sermons uploaded to YouTube in or around November and December, 2020 Pastor J.D. Farag has discussed the Lease and AT&T's equipment with his parish, stating:  "We have been making this appeal for prayer concerning the relocation of the cell antennas on our building . . . we have done everything that we can legally, per the Lease, with the termination of the Lease."[1]

## COUNT I (DECLARATORY RELIEF)

76.     AT&T realleges and incorporates paragraphs 1-75.

77.     An actual and ripe controversy exists between Landlord and AT&T concerning the Lease.

78.     Landlord contends that AT&T's notice of its extension of the Lease was untimely and allows Landlord the right to unilaterally terminate the Lease.

---

[1] *See, e.g.,* Bible Prophecy Update - December 20th, 2020 ("The End of the World"), J.D. Farag YouTube Channel, *located at* https://www.youtube.com/watch?v=Sk3gBT1lUhg&t=108s.

79.    AT&T contends that it has the right to extend the Lease, and that Landlord is not entitled to unilaterally terminate the Lease, under long-standing principles of equity and the Hawaiʻi Supreme Court's decision in *Aickin v. Ocean View Investments Company, Inc*., 84 Haw. 447, 455, 935 P.2d 992, 1000 (1997), *as amended* (Apr. 18, 1997).  Among other things, AT&T did not provide the purported untimely notice intentionally, willfully, or with gross negligence; Landlord did not rely to its detriment on AT&T's purported untimely notice; strict enforcement of the Lease's written notice provision would result in unconscionable hardship to AT&T, AT&T's customers, and Hawaiʻi "first responders"; any delay in providing written notice was not unreasonably long within the context of a thirty-year lease term, especially because AT&T provided notice before the Lease expired; and AT&T is not in material breach of the Lease.

80.    Landlord also contends that AT&T must immediately remove its equipment from the Rooftop Premises and that AT&T no longer has the right to access the Rooftop Premises after January 31, 2021.

81.    AT&T contends that it has the right to use and access the Rooftop Premises under the Lease through November 30, 2025.

82.    AT&T contends that Landlord did not provide the required notice and 30-day opportunity to cure before attempting to declare a default and terminate Lease.

83.    Landlord contends that its attempt to declare a default and terminate the Lease is proper and authorized by the Lease.

84.    A judicial determination resolving the above-described controversies is necessary and appropriate at this time.

85.    AT&T respectfully requests declaratory judgments under 28 U.S.C. § 2201.

## COUNT II (INJUNCTIVE RELIEF)

86.    AT&T realleges and incorporates paragraphs 1-85.

87.    If Landlord wrongfully terminates the Lease, or if Landlord wrongfully prevents AT&T from accessing, maintaining, using, or operating its equipment and infrastructure on the Rooftop premises, AT&T will suffer serious, irreparable, and permanent harm, including, without limitation, a loss of its right to the quiet enjoyment of the Rooftop Premises, interruptions or loss of service provided to customers in an approximately 3/4 square mile area, including interruptions to the FirstNet platform relied on by "first responders," and intangible losses such as loss of reputation and goodwill.

88.    AT&T has no adequate remedy at law for the above-described harm; money damages will be difficult to quantify and will also be inadequate to remedy AT&T's loss of quiet enjoyment, the interruptions or loss of service for AT&T customers in an approximately 3/4 square mile area, including interruptions

to the FirstNet platform relied on by "first responders," and intangible losses for AT&T such as loss of reputation and goodwill.

89.    AT&T is likely to prevail on the merits, under long-standing principles of equity and the Hawaiʻi Supreme Court's decision in *Aickin v. Ocean View Investments Company, Inc*., 84 Haw. 447, 455, 935 P.2d 992, 1000 (1997), *as amended* (Apr. 18, 1997).  Under the circumstances, AT&T has the right to extend the Lease through November 30, 2025, and Landlord is not entitled to unilaterally terminate the Lease or prevent AT&T from accessing and using the Rooftop Premises.

90.    AT&T has the right to injunctive relief, including preliminary injunctive relief, prohibiting Landlord from:  (1) purporting to terminate the Lease based on AT&T's supposedly late notice extending the Lease; (2) impairing, impeding, or restricting AT&T's access to the Rooftop Premises; (3) impairing, impeding, or restricting AT&T's use of its equipment or infrastructure in connection with communications related activities, including, without limitation, the FirstNet first responder communications platform.

## COUNT III (BREACH OF CONTRACT)

91.    AT&T realleges and incorporates paragraphs 1-90.

92.    The Lease is an enforceable contract between AT&T and Landlord.

93.    AT&T has performed, or substantially performed, under the Lease.

94.    AT&T provided adequate, actual notice of its extension of the Lease through November 30, 2025.

95.    Under the Lease, as interpreted by controlling Hawaiʻi law and principles of equity, AT&T has the right to extend the Lease through November 30, 2025.

96.    Under the Lease, as interpreted by controlling Hawaiʻi law and principles of equity, AT&T has the right to use the Rooftop Premises, and access the Rooftop Premises, through November 30, 2025.

97.    Under the Lease, Landlord may not declare a default or purport to terminate the Lease without first providing a minimum 30-day right to cure.

98.    Landlord's above-described conduct, including, without limitation, its attempt to unilaterally terminate the Lease without providing a 30-day right to cure and in violation of controlling precedent from the Hawaiʻi Supreme Court, is a breach, or anticipatory breach, of the Lease.

99.    AT&T has the right to specific performance under the Lease.

100.   As a result of Landlord's breaches, or anticipatory breaches, AT&T will suffer damages, including, without limitation, the estimated approximately $650,000.00 to relocate the subject antennas (which costs would

include, *inter alia*, needed structural modifications to accommodate the antennas, shelters and pads, running fiber-optic and power cables to the new location, and purchasing replacement equipment), as well as any replacement lease costs.

101.   AT&T has the right to damages, in an amount to be proven at trial.

102.   AT&T has the right to an award of its attorney's fees.

WHEREFORE, AT&T petitions this Court for the following relief:

A.   Declaratory relief;

B.   Injunctive relief, including preliminary injunctive relief;

C.   An award of damages in an amount to be proven at trial;

D.   An award of attorney's fees and costs;

E.   Other and further relief as this Court deems just and proper, including all equitable remedies provided by Hawaiʻi law.

DATED:  Honolulu, Hawaiʻi, January 21, 2021.


/s/ *William M. Harstad*
WILLIAM M. HARSTAD
KATHERINE A. GARSON
IAN R. WESLEY-SMITH

Attorneys for Plaintiff
NEW CINGULAR WIRELESS PCS,
LLC dba AT&T MOBILITY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| NEW CINGULAR WIRELESS PCS, LLC dba AT&T MOBILITY | CIVIL NO. _____ |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| vs. | |
| CALVARY CHAPEL KANEOHE INC., | |
| Defendant. | |

## DEMAND FOR JURY TRIAL

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure,

Plaintiff NEW CINGULAR WIRELESS PCS, LLC dba AT&T MOBILITY

hereby demands a trial by jury on any and all issues triable by a jury.

DATED:  Honolulu, Hawaiʻi, January 21, 2021.


/s/ *William M. Harstad*
WILLIAM M. HARSTAD
KATHERINE A. GARSON
IAN R. WESLEY-SMITH

Attorneys for Plaintiff
NEW CINGULAR WIRELESS PCS,
LLC dba AT&T MOBILITY